UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CURTIS HARRIS,

                     Plaintiff,                           Case No. 2:08-cv-131

v.                                         Honorable Robert Holmes Bell

P. JONES, et al.,

                     Defendants.

_____/

**REPORT AND RECOMMENDATION**

Plaintiff Curtis Harris, an inmate at the Alger Maximum Correctional Facility (LMF), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Captain P. Jones, Lieutenant J. Adams, Sergeant Unknown Tenuta, C. Scott, Sergeant Unknown Livermore, Resident Unit Officer Unknown Sebaly, Corrections Officer V. Seymour, Corrections Officer M. Rankin, Resident Unit Officer Unknown Sego, Doctor Fernando Frontera, and Corrections Officer Unknown Santure.

Plaintiff alleges in his complaint that on April 3, 2007, at approximately 4:50 p.m., Defendants Sebaly, Sego, Santure, Seymour, Rankin and Livermore came to Plaintiff's cell in administrative segregation after Plaintiff broke his cell window. Defendant Sebaly ordered Plaintiff to place his property on the bed and to sweep his foot in front of the cell door. Plaintiff complied with the order. Defendant Sebaly then ordered Plaintiff to strip so that a strip search could be conducted. Plaintiff removed his clothes and handed them to Defendants Sebaly and Sego through the top slot. Defendant Sebaly ordered Plaintiff to hold his arms out to his sides and to show the

palms of his hands, but when Plaintiff complied, Defendant Sebaly announced that Plaintiff was not following the order. Defendant Sebaly repeated the order a few more times and Plaintiff continued to comply with the order, stating that the video should be on him so that he could demonstrate his compliance. Defendant Sebaly falsely stated that Plaintiff was not following orders and Defendant Livermore threatened to use chemical agents.

During this time, the video recorder was held by Defendant Seymour. Defendant Livermore observed Plaintiff following the order to hold his arms to his sides and to show his palms, but agreed that Plaintiff was not following orders. Defendant Livermore then sprayed a chemical agent into Plaintiff's cell in a five to six second blast. Plaintiff claims that he was almost choked to death and that his eyes and skin burned as a result of the chemical agent. Plaintiff was then placed in hard restraints and removed from his cell.

Plaintiff was taken down the hall and his restraints were exchanged for soft restraints. Plaintiff was vomiting and distressed. Defendant Scott rinsed Plaintiff's eyes. Plaintiff complained to Defendants Scott and Livermore that his skin was burning and asked to take a shower. Plaintiff was also having difficulty breathing, so Defendant Scott administered Plaintiff's asthma inhaler. Defendant Livermore ordered that Plaintiff be placed in a cell without a shower. Plaintiff later complained about the lack of shower and clean clothes to Defendant Jones, who told Plaintiff that he might get a shower in a few minutes. Plaintiff did not receive a shower.

At approximately 7 p.m., Defendant Scott brought Plaintiff his blood pressure medication. Plaintiff complained about the lack of a shower, as well as burning skin, eyes, and nose and difficulty breathing. Defendant Scott told Plaintiff to bring up his problems with custody. At around 7:10 p.m., Defendant Adams and Defendant Tenuta told Plaintiff that he did not have a

shower coming. Plaintiff was taken out of restraints around 8:30 a.m. on April 4, 2007, and finally received a shower at approximately 3:20 p.m. that day.

Plaintiff claims that when he arrived at LMF on October 10, 2006, Plaintiff had a medical detail regarding the use of chemical agents, which covered the period from March 17, 2006, to September 30, 2007. Defendant Frontera has refused to renew his detail for chemical agents despite Plaintiff's health problems. Defendant Frontera stated that staff safety was more important than any risk to Plaintiff's health, and that renewing this detail would place staff at a high risk of harm. Thereafter, Plaintiff was not removed from the unit prior to the use of chemical agents.

Plaintiff claims that after his exposure to chemical agents on April 3, 2007, his health has worsened. Plaintiff states that he has since been diagnosed as having hypoglycemia and that the left side of his neck, lower chest and upper stomach occasionally swell up. Plaintiff also states that he has a solid mass in his neck, "swooping sounds / murmur" in chest and neck, and difficulty swallowing. Plaintiff suffers from heavy night sweats, dizziness, tingling, and lightheadedness.

Plaintiff claims that Defendants' conduct violated his rights under the Eighth Amendment. Plaintiff is suing Defendants in their individual and official capacities and is seeking compensatory and punitive damages, as well as declaratory and injunctive relief.

Presently before the Court are the Defendants' Motions to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), and/or for Summary Judgment, pursuant to Fed. R. Civ. P. 56 (docket #48 and #49). Plaintiff has filed a response to Defendant Frontera's motion, but has failed to file a response to the motion for summary judgment filed by Defendants Sego, Santure, Jones, Adams, Tenuta, Scott, Livermoer, Sebaly, Seymour, and Rankin. Plaintiff was granted an extension of time to file a response, but failed to file any response. The matter is now ready for decision. Because both sides

have asked that the Court consider evidentiary materials beyond the pleadings, the standards applicable to summary judgment apply. *See* Fed. R. Civ. P. 12(b).

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close***,** 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Initially, Defendants state that they are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies. A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and

prove. *Jones v. Bock*, 127 S. Ct. 910, 919-21 (2007). A moving party without the burden of proof need show only that the opponent cannot sustain his burden at trial. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PRLA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he

seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007); *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 127 S. Ct. at 922-23.

MDOC Policy Directive 03.02.130 (effective Dec. 19, 2003)[1], sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control *Id.* at ¶ R. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶¶ R, X. The Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly. Information provided shall be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ T (emphasis in original). The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ Y.

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within five business days of the

---

[1]The MDOC amended Policy Directive 03.02.130 on July 9, 2007. However, the 2003 version of the policy directive was in effect at all times applicable to this lawsuit.

response, or if no response was received, within five days after the response was due.  *Id.* at ¶¶ R, DD.  The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a medical care grievances.  *Id.* at ¶ FF.  If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶¶ R, HH.  The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due.  *Id.* at ¶ HH.  The Prisoner Affairs Section is the respondent for Step III grievances on behalf of the MDOC director.  *Id.* at ¶ II.  Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process.   *Id.* at ¶ U.   "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall be completed within 90 calendar days unless an extension has been approved . . . ."  *Id.*

In addition, the grievance policy provides that, where the grievance alleges staff brutality or corruption, the grievance may be submitted directly to Step III.  *Id.* at ¶S.  In such instances, the grievance must be filed within the time limits prescribed for filing grievances at Step I. *Id.*

As noted above, Plaintiff's claims against Defendant Frontera involve the refusal to renew his medical detail for chemical agents, which expired on September 30, 2007.  Plaintiff claims that the use of chemical agents to remove him from his cell on April 3, 2007, caused him to suffer physical injuries.  Plaintiff claims that the continued refusal of Defendant Frontera to authorize his removal from the unit prior to the use of chemicals agents constitutes deliberate indifference.  In his response to Defendant Frontera's motion, Plaintiff states that his medical conditions include a "brain aneurysm right carotid artery, brain stent and two coils right carotid artery, right brain damage from brain aneurysm rupture, asthmatic, thyrotoxicosis, [and] hypertension."

Defendant Frontera attaches copies of grievances filed in 2007 and 2008 by Plaintiff, as well as a grievance inquiry showing each grievance filed by Plaintiff and appealed to step III. In Plaintiff's complaint, he specifically states that Defendant Frontera was deliberately indifferent to his serious medical needs on October 16, 2006, November 7, 2006, November 10, 2006, December 6, 2006, January 5, 2007, April 30, 2007, and September 14, 2007 (docket #1, p. 6). Defendant Frontera asserts that the grievance inquiry shows that Plaintiff did not file grievances within five days of October 16, 2006, November 7, 2006, November 10, 2006, January 5, 2007, or September 14, 2007, as required by MDOC policy. Defendant Frontera also states that the grievances dated April 30, 2007, were coded 17b and 09z which represent personal retaliation and food issues, not medical issues. (*See* MDOC grievance category codes, Defendant Frontera's Exhibit E.) Defendant Frontera asserts that the only timely grievances regarding medical issues during the pertinent time period were filed on December 8, 2006, which is within five days of December 6, 2006. However, Defendant Frontera notes that he was not named in those grievances.

In response to Defendant Frontera's motion, Plaintiff states that Defendant Frontera failed to produce the following grievances which relate to his health care concerns: LMF 2006-11-4019-12e4, LMF 2006-11-4031-12d4, LMF 2006-11-4278-12d3, LMF 2006-11-4126-12d4, LMF 2006-11-4428-12d1, LMF 2006-11-4545-12e4, and LMF 2006-11-4427-12g4. Plaintiff states that he cannot produce copies of these grievances because his property has gone missing, but that one of these grievances concerned Defendant Frontera's refusal to renew Plaintiff's chemical agent detail.

A review of the grievance inquiry for Plaintiff reveals that he did indeed file the above grievances and that he appealed the denial of these grievances to step III. (*See* Defendant Frontera's Exhibit C, p. 2 of grievance inquiry.) Plaintiff claims that he was seen by Defendant Frontera on October 16, 2006, November 7, 2006, November 10, 2006, December 6, 2006, January 5, 2007,

April 30, 2007, and September 14, 2007, and that his request for a detail regarding the use of chemical agents was denied on these occasions. On November 7, 2006, Plaintiff filed LMF 2006-11-4019-12e4, and on November 8, 2006, Plaintiff filed LMF 2006-11-4031-12d4. Contrary to Defendant Frontera's assertions, both of these grievances were filed within five days of one of the dates of the alleged misconduct. In addition, LMF 2006-11-4126-12d4 was filed on November 14, 2006, four days after the alleged misconduct on November 10, 2006, and LMF 2006-12-4428-12d1 and LMF 2006-12-4427-12g4 were both filed on December 8, 2006, two days after the alleged misconduct on December 6, 2008. Because these grievances are not part of the record in this case, the court is unable to determine whether they served to administratively exhaust Plaintiff's claim against Defendant Frontera. Consequently, the undersigned concludes that Defendant Frontera is not entitled to summary judgment for failure to exhaust administrative remedies.

In their motion for summary judgment, Defendants Adams, Jones, Livermore, Rankin, Santure, Sego, Seymour, Scott, Sebaly, and Tenuta state that they Plaintiff failed to exhaust his administrative remedies with regard to all of the named Defendants. Defendants assert that Plaintiff's only exhausted grievance regarding the events on April 3, 2007, named Defendants Adams, Jones, Scott, and Tenuta and only concerned the denial of a shower after the chemical agent was administered. In support of this assertion, Defendants attach a copy of LMF-07-04-1343-17B to their brief, which shows that Plaintiff named Defendants Adams, Jones, Scott, and Tenuta. (*See* Defendants' Exhibit C, Attachment 2.) Defendants state that Plaintiff filed other grievances regarding this issue, but that they were rejected as duplicative. One of those rejected grievances is attached as an exhibit to Defendants' brief and names Defendants Sebaly, Sego, Seymour, Santure and Scott. In this grievance, Plaintiff complains about the actual use of the chemical agent, as well as his treatment after application of the chemical agent. (*See* LMF 07-04-1386-28A, Defendants'

Exhibit C.) Defendants do not attach copies of any other rejected grievances. However, the fact that Plaintiff filed grievances that were "duplicative" implies that he previously filed a grievance on the issues raised. Moreover, Plaintiff appealed the rejection of these grievances to step III. Plaintiff is not required to take any further action. Therefore, Defendants have failed to meet their burden to show that Plaintiff did not exhaust his administrative remedies.

Defendant Frontera also claims that he is entitled to summary judgment because he was not deliberately indifferent to Plaintiff's serious medical need. The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer*, 62 F.3d at 154-55; *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received

inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). Where, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

In his complaint, Plaintiff states that the reason his detail regarding the use of chemical agents was not renewed was because it would constitute a high risk of danger to staff. Defendant Frontera states that such a rationale does not rise to the level of deliberate indifference. In addition, Defendant Frontera states that the refusal to renew Plaintiff's medical detail was merely a difference of medical judgment.

In the administrative progress note from 4:29 p.m. on April 3, 2007, Mandi J. Salmi, R.N., noted that Plaintiff was a "high risk for chemical agent." The SOAP note summary from 6:15 p.m. on April 3, 2007, by Defendant Scott states that Plaintiff asked for his inhaler and requested that his eyes be cleaned out. Defendant Scott gave Plaintiff two puffs from his inhaler, checked his restraints, and observed that his circulation was uncompromised. Defendant Scott recorded a second note at 8:59 p.m., stating that Plaintiff was requesting a shower to wash off the chemical agent and that the restraints were movable on all extremities, and that no compromise in circulation was noted. On April 3, 2007, at 11:25 p.m., Mary Rose Galloway, R.N., noted that Plaintiff was lying in a supine position on his bunk, that his respirations were easy and regular, and that he appeared to be sleeping. Ms. Galloway also noticed that Plaintiff's restraints were in a proper position and that no

circulatory impairment was noted distally. Ms. Galloway rechecked Plaintiff at 4:27 a.m. on April 4, 2007, and noted that Plaintiff was positioned on his left side with easy and regular respirations and appeared to be sleeping deeply. The restraints were in the proper position and there was no circulatory impairment to his extremities. (*See* docket #64, pp. 1-5.)

The April 6, 2007, kite response by Defendant Scott notes that Plaintiff was complaining of burning of his skin, throat and eyes, and pain in his stomach, chest and back. Plaintiff was scheduled for a sick call on April 9, 2007. On April 20, 2007, Sandra Monroe, R.N., recorded that Plaintiff's examination showed that Plaintiff's respiratory and cardiovascular systems appeared normal and that he was ambulating well. Ms. Monroe observed swelling on the left side of Plaintiff's neck, and noted that Plaintiff was complaining of stomach and chest pain due to reflux. Plaintiff was scheduled for a follow-up appointment on April 27, 2007. (*See* docket #64, pp. 6-10.)

It appears from Plaintiff's medical records that his alleged injuries, which include temporary pain, coughing, dizziness, skin and eye irritation, and mental distress, appear to be no more than the normal aftereffects of being exposed to gas and/or chemical agents. Therefore, the fact that Plaintiff suffered from certain medical conditions does not appear to have been a factor in his injuries. Moreover, in the opinion of the undersigned, Plaintiff's claims against Defendant Frontera are merely that he received inadequate medical treatment." *Westlake*, 537 F.2d at 860 n. 5. As noted above, where the dispute is over the adequacy of the treatment, such a claim does not rise to the level of an Eighth Amendment violation. Therefore, the undersigned recommends that Defendant Frontera be granted summary judgment.

In their motion for summary judgment, Defendants Adams, Jones, Livermore, Rankin, Santure, Sego, Seymour, Scott, Sebaly, and Tenuta state that they are entitled to summary judgment because their conduct did not violate the Eighth Amendment. Plaintiff claims that

Defendants' use of a chemical agent constituted excessive force. The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *See Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981); *Trop v. Dulles*, 356 U.S. 86, 101 (1958). The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346. Among unnecessary and wanton infliction of pain are those that are "totally without penological justification." *Id.*

The Supreme Court has held that "whenever guards use force to keep order," the standards enunciated in *Whitley v. Albers*, 475 U.S. 312 (1986), should be applied. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. In determining whether the use of force is wanton and unnecessary, the court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any efforts made to temper the severity of the forceful response. *Id.* (citing *Whitley*, 475 U.S. at 321). Under this standard, even deadly force may be constitutionally appropriate under certain circumstances. *Gravely v. Madden*, 142 F.3d 345, 348 (6th Cir. 1998).

The analysis of the degree of force used must be made in the context of the constant admonitions by the Supreme Court that courts must accord deference to prison or jail officials as they attempt to maintain order and discipline within dangerous institutional settings. *See, e.g.*, *Whitley*, 475 U.S. at 321-22. Plaintiff alleges that Defendants violated his rights by applying a chemical agent when they knew that he had serious health issues.

According to the critical incident report written by Defendant Jones:

On 4/3/07, Aspen Unit staff notified Control Center that prisoner Harris #218238, lock Aspen 113; had shattered his cell door window. R.N. Sebaly was notified at 1629 hours. R.N. Sebaly advised that prisoner Harris was high risk for use of chemical agent. Warden Bergh was notified and approved use of chemical agent to place prisoner Harris into soft restraints and use of restraints over two hours to control prisoner Harris's disruptive behavior. A move team was assembled consisting of: [Sergeant] Livermore (move team supervisor), officer Sebaly (shield), officer Sego (restraints), officer Santure (assist), officer Rankin (breach) and officer Seymour (vtr operator). The move team reported to cell 113 at 1659 hours. [Sergeant] Livermore instructed prisoner Harris to follow all instructions given to him by the move team. [Sergeant] Livermore further advised that failure to comply would result in use of chemical agent. Officer Sebaly began to conduct a strip search on prisoner Harris. Prisoner Harris would not show officer Sebaly the palm of his hands. Officer Sebaly repeated his instructions to prisoner Harris. Prisoner Harris would not show officer Sebaly the palms of his hands. [Sergeant] Livermore instructed officer Rankin to administer the chemical agent. Officer Rankin administered a short burst of chemical agent (Fox 2%) into the cell via the upper cell door slot. After a few minutes, prisoner Harris complied with officer Sebalys instructions and a strip search was completed. Officer Sego then applied the ankle portion of soft restraints on prisoner Harris, via the lower cell door slot. Officer Sego then applied belly chain restraints on prisoner Harris via the upper cell door slot. Officer Rankin keyed open the cell door. The move team escorted prisoner Harris to the shower stall area. Officer Sego applied the waist/wrist portion of the soft restraints on prisoner Harris. [Sergeant] Livermore checked the application of the soft restraints and approved them. R.N. Scott checked the application of the soft restraints and approved them. R.N. Scott then rinsed prisoner Harris's eyes with saline solution. R.N. Scott also admininster two puffs of an inhaler to prisoner Harris. The move team escorted prisoner Harris to cell 139. Officer Sego removed the belly chain restraints. Prisoner Harris was secured into cell 139 at 1721 hours. The move team left the wing.

(*See* Defendants' Exhibit A, Attachment 1, pp. 1-3.)

The reports of other staff members support Defendant Jones' description of the use of chemical agent on Plaintiff on April 3, 2007. The undersigned notes that Plaintiff was found

guilty of a major misconduct for destruction of property related to the incident. (*See* Defendants'
Exhibit A, Attachment 2, p. 2.) Plaintiff was also found guilty of disobeying a direct order to show
Defendant Sebaly his palms. In the hearing report, Hearing Officer Maki indicated that she had
viewed the video of the incident, and that it did not show Plaintiff in his cell when the officer was
giving the order to show Plaintiff his palms, as the officer was standing directly in front of Plaintiff's
cell window, between the window and the camera. However, Defendant Sebaly was heard ordering
Plaintiff to show the palms of his hands at least 10 times, and reported to Defendant Livermore that
Plaintiff would only give him the thumbs up sign. Hearing Officer Maki found that, based on the
record, Plaintiff was guilty of the charge. (*See* Defendants' Exhibit A, Attachment 2, pp. 3-4.)

   A review of the record supports Defendants' assertion that Plaintiff refused a direct
order to show Defendant Sebaly his palms and to allow restraints to be applied. Defendants' use of
force was reasonable given Plaintiff's prior repeated refusals to submit to authority. The Sixth
Circuit has noted that inmates cannot be permitted to decide which orders they will obey and when
they will obey them. *See Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992). In circumstances
where lawful orders are being disregarded, prison officials are entitled to use a reasonable amount
of force to obtain compliance. *Id.* "One can quickly reason what would happen in a maximum
security prison without proper discipline." *See Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984).
In an unpublished case that is similar with this case, the Sixth Circuit stated:

> Plaintiff was sprayed with gas only after he refused to allow Officer
> Beesley to place him in restraints. Under these circumstances, the
> defendants acted reasonably in spraying gas at plaintiff. This allowed
> them to restrain plaintiff in a more peaceful manner. Therefore, it was
> plaintiff's own conduct which necessitated the use of the gas.

*Knuckles El v. Koskinen*, No. 97-1642, 1998 WL 415847, at *2 (6th Cir. June 16, 1998). The
decision to use a chemical agent to obtain physical control is generally preferable to the use of

physical force. The response team could have attempted a "cell-rush" with shields, truncheons, and handcuffs to forcibly enter Plaintiff's cell in an attempt to subdue and restrain him. Other courts have found that these types of physical confrontations are less safe than using tear gas or mace because of the greater risk of injury to staff, the inmate, or both. *Caldwell*, 968 F.2d at 602; *Soto*, 744 F.2d at 1262. Thus, the Defendants in this action choose to use a lesser degree of force. Given the facts, the decision to use a chemical agent in order to place Plaintiff in restraints did not violate the Eighth Amendment.

Plaintiff also claims that Defendants were deliberately indifferent to his medical needs when they denied him a shower immediately after he was exposed to the chemical agent. Plaintiff has not shown that he suffered injury from not being able to wash off the chemicals. As noted above, Plaintiff's medical records show that his alleged injuries, which include temporary pain, coughing, dizziness, skin and eye irritation, and mental distress, appear to be no more than the normal aftereffects of being exposed to gas and/or chemical agents. Plaintiff was given an eye wash and his inhaler was administered to treat his complaints of coughing and burning in his throat. Plaintiff was checked numerous times in the hours following the use of chemical agents and was observed to be in no acute distress.

In addition, Defendant Scott attests that although an eyewash is needed to prevent mucus membrane irritation after the administration of a chemical agent, a shower is not usually necessary and was not medically indicated in Plaintiff's case. Defendant Scott also states that even though Plaintiff was breathing normally after the incident, he administered Plaintiff's asthma inhaler. Defendant Scott attests that a full examination of Plaintiff was conducted on April 20, 2007, and no irritation or rash was detected on Plaintiff's skin. (*See* Defendants' Exhibit B, Defendant Scott Affidavit.)

Defendants also offer the affidavit of Defendant Jones, who attests that she does not recall if Plaintiff requested a shower, but if he had, she would have advised him that he would be allowed to shower once he was removed from soft restraints. Defendant Jones attests that the duration of time in soft restraints was determined by Plaintiff's behavior. In addition, Defendant Jones states that Plaintiff had access to water in his cell and that there is enough flexibility in soft restraints to allow a prisoner to wash himself in his cell. Furthermore, Defendant Jones attests that Plaintiff was removed from restraints at 8:30 a.m. the next morning. (*See* Defendants' Exhibit A, Defendant Jones Affidavit.)

Defendant Adams attests that he checked on Plaintiff at approximately 8:52 p.m., and that Plaintiff was kept in restraints because he appeared agitated and refused to calm down and speak to Defendant Adams in a rational manner. Defendant Adams states that Plaintiff complained about staff but did not complain about needing a shower. (*See* Defendants' Exhibit E, Defendant Adams' affidavit.) Defendant Tenuta attest that he made routine checks on Plaintiff' during the evening of April 3, 2007, and noticed that Plaintiff was sitting on his bed. Plaintiff did not appear to be in distress and made no statements regarding burning eyes, burning skin, coughing or difficulty breathing. (*See* Defendants' Exhibit F, Defendant Tenuta's affidavit.) Plaintiff concedes that he received a shower at 3:20 p.m. on April 4, 2007, less than 24 hours after he was exposed to a chemical agent. (*See* Plaintiff's complaint, p. 6.)

Plaintiff has not filed a response to Defendants' motion for summary judgment and has not shown any injury. The Sixth Circuit has found that spraying an inmate three times with a chemical agent was not excessive, particularly considering that inmate did not suffer serious injuries but only experienced a temporary burning and temporary skin discoloration. *Knuckles-El*, 1998 WL

136596, at *1.  In this case, there is absolutely no proof that Plaintiff suffered injury from not being able to wash off the chemical agents.  Consequently, there is no issue of material fact for the jury.

Defendants claim that they are entitled to qualified immunity because Plaintiff has failed to show a violation of clearly established law.  Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful.  *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

The procedure for evaluating claims of qualified immunity is tripartite:  First, we determine whether a constitutional violation occurred;  second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.  *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999).

When determining whether a right is clearly established, this court must look first to decisions of the United States Supreme Court, then to decisions of the Sixth Circuit and to other courts within this Circuit, and finally to decisions of other circuits.  *Dietrich*, 167 F.3d at 1012.  An official action is not necessarily protected by qualified immunity merely because the very action in question has not previously been held to be unlawful.  Rather, in light of pre-existing law, the

unlawfulness of the official's conduct must be apparent. *Dietrich*, 167 F.3d at 1012; *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

When making a qualified immunity analysis, the facts must be interpreted in the light most favorable to the plaintiff. Part of the analysis is to determine whether there are any genuinely disputed questions of material fact. *Kain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir. 1998). Where there is a genuinely disputed question of fact, it is for the trier of fact to resolve, not the judge. "This would be true notwithstanding that the trial judge found the [defendant] officer to be more credible than the plaintiff because it is not for the court to make credibility determinations at this stage of the proceeding." *Id.*

The operation of the qualified immunity standard depends substantially upon the level of generality at which the relevant legal rule is to be identified.

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the preexisting law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 639-40. *See also Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996), *cert. denied*, 520 U.S. 1157 (1997).

The Sixth Circuit has observed:

> A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred.

*Durham*, 97 F.3d at 866 (citing *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)).

Thus qualified immunity is not triggered only where the very action in question was previously held unlawful. *Anderson*, 483 U.S. at 639-40. Rather, the test is whether the contours

of the right were sufficiently clear that a reasonable official would understand that what he is doing violated plaintiff's federal rights. *Id.*

Furthermore, a defendant need not actively participate in unlawful conduct in order to be liable under Section 1983. Rather, a defendant may be liable where he has a duty to protect a plaintiff and fails to comply with this duty. *Durham*, 97 F.3d at 866-868 (holding that a nurse and a security guard at a state hospital may be liable under Section 1983 where they do not take action to prevent a patient from being beaten). *See also McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990)(a correctional officer who observes an unlawful beating may be liable under Section 1983 even though he did not actively participate in the beating), and *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), *cert. denied sub nom*, *Bates v. Bruner*, 459 U.S. 1171 (1983)(police officers who stood by and observed an unlawful beating by fellow officers could be held liable under Section 1983).

When faced with a qualified immunity defense, the court must first determine whether or not the plaintiff has stated a claim upon which relief can be granted. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *Turner*, 119 F.3d at 429. If the court answers that question in the affirmative, the court goes on to determine whether or not the right allegedly violated was clearly established. *Turner*, 119 F.3d at 429. These are both purely legal questions. The immunity issue should not be resolved if there are factual disputes on which the issue of immunity turns such that it cannot be determined before trial whether the defendants' conduct violated clearly established rights. *Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991). As noted above, Defendants have shown that their conduct did not rise to the level of an Eighth Amendment violation. Therefore, they are entitled to qualified immunity.

In summary, in the opinion of the undersigned, Plaintiff has failed to sustain his burden of proof in response to Defendants' motions for summary judgment. Accordingly, it is recommended that Defendants' Motions for Summary Judgment (Docket #48 and #49) be granted and this case be dismissed in its entirety.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal. Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455 appellate filing fee in one lump sum.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).


 /s/ Timothy P. Greeley                                        
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  July 13, 2009

- 22 -